USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4-2-09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------X
UNITED STATES OF AMERICA,       :

    -against-                    :

OUSSAMA ABDULLAH KASSIR,        :
   a/k/a "Abu Abdullah,"
   a/k/a "Abu Khadija,"         :

        Defendant.           :
------------------------------X

S2 04 Cr. 356 (JFK)

**OPINION and ORDER**

APPEARANCES:

    For the United States of America:
      MICHAEL J. GARCIA
      United States Attorney for the
      Southern District of New York
      New York, New York
      Of Counsel: Eric B. Bruce
              Michael Farbiarz
              Assistant United
              States Attorneys

    For the Defendant:
      Mark S. DeMarco, Esq.
      Bronx, New York
      Edgardo Ramos, Esq.
      New York, New York

**JOHN F. KEENAN, United States District Judge**

**JOHN F. KEENAN, United States District Judge:**

Defendant Oussama Abdullah Kassir, a/k/a "Abu Abdulla" a/k/a "Abu Khadija," is charged in a second superseding indictment (the "Indictment") with, among other things, providing and conspiring to provide material support to the foreign terrorist organization al Qaeda. Trial is set to commence on April 13, 2009.[1] Before the Court is Defendant's motion (doc. # 65) to exclude the testimony of the Government's terrorism expert, Evan Kohlmann, who would testify to the origins, history, structure, leadership, and operational methods of al Qaeda, among other things. For the reasons that follow, the motion is denied, but a Daubert hearing on the witness's qualification in a particular area is required.

### Background

The Court presumes familiarity with the underlying factual allegations in this case, which are detailed in a prior decision, United States v. Kassir, No. S2 04 Cr. 356 (JFK), 2008 WL 2653952 (S.D.N.Y. July 3, 2008). Only facts relevant to the instant motion are discussed below.

---

[1] Kassir's two co-defendants, Mustafa Kamel Mustafa a/k/a "Abu Hamza," a/k/a "Abu Hamza Al-Masri," and Haroon Rashid Aswat, remain imprisoned overseas awaiting extradition. A third co-defendant, Earnest James Ujaama, was separately charged in a four-count information and pleaded guilty to those counts on August 13, 2007.

I. The Charges Against Kassir

The Indictment contains two sets of charges against Kassir. The first relates to his alleged efforts to establish a jihad training camp in Bly, Oregon. Counts Three through Six of the Indictment charge him with providing and conspiring to provide material support to terrorists and to al Qaeda, in violation of 18 U.S.C. §§ 2, 371, 2339A, and 2339(B)(a)(1). Count Seven charges him with conspiring to kill, kidnap, maim, and injure persons in a foreign country, in violation of 18 U.S.C. § 956(a). As overt acts in furtherance of the Bly, Oregon plot, Kassir is alleged, among other things, to have instructed two individuals on how to slit a person's throat and use a knife in hand-to-hand combat, to have discussed a plan to kill truck drivers traveling through Oregon and steal their cargo for money and goods to support the jihad training camp, and to have distributed to several persons a CD-ROM containing instructions on how to make bombs and poisons.

The second set of charges relates to Kassir's alleged establishment and operation of terrorist websites. Counts Eight through Eleven charge him with using the websites to provide, and in a conspiracy to provide, material support to terrorists and to al Qaeda. Count Twelve charges him with using the websites in a conspiracy to kill, kidnap, maim, and injure persons in a foreign country. Count Thirteen charges him with

-2-

using the websites to distribute information relating to explosives, destructive devices, and weapons of mass destruction, with the intent that such information be used for and in furtherance of crimes of violence, in violation of 18 U.S.C. §§ 2, 842(p)(2)(A). Finally, Count Fourteen charges him with using the websites to assist and induce persons to develop, produce, and use chemical weapons, in violation of 18 U.S.C. §§ 2, 229(a). The overt acts alleged in respect to this set of charges include establishing and operating certain websites which contained, among other things, terrorist materials and information and instructions on how to build bombs and make poisons. The Government has since disclosed its intent to prove at trial that Kassir operated these websites through an umbrella organization known as the Islamic Media Center ("IMC").

## II. Kohlmann's Proffered Testimony

By letter dated March 3, 2009, the Government gave notice of its intent to call Evan Kohlmann as an expert on al Qaeda and other terrorist organizations. A copy of Kohlmann's curriculum vitae was provided (the "Kohlmann CV").

The Government proffers Kohlmann to testify about the origins, history, structure, leadership, and operational methods of al Qaeda. With respect to leadership, Kohlmann would identify for the jury several key leaders and members of al Qaeda, including Usama bin Laden, Khalid Sheik Mohammed, Dr.

- 3 -

Ayman al-Zawahiri, and others. With respect to operational methods, Kohlmann would testify about (i) how al Qaeda and other terrorists recruit and train their members and associates; (ii) the importance of training camps and how they are utilized; (iii) the use of safehouses to travel to training camps in certain areas of the world; (iv) the different roles individuals play in al Qaeda; (v) how individuals provide support to terrorist organizations like al Qaeda; (vi) what it means to be a member of al Qaeda; (vii) al Qaeda tradecraft; (viii) the use of "cells" to perform terrorist operations; (ix) the compartmentalization of information; and, (x) terrorist fundraising techniques. Additionally, Kohlmann would testify about how the Internet is used as a means of communication among terrorists, and how it is used by al Qaeda to distribute propaganda, training materials, and recruiting materials.

The Government also would have Kohlmann testify about the history, structure, leadership and operational methods of "other terrorist organizations." This would include identification of key leaders and members of the Taliban. It also would include brief testimony about the terrorist organizations known as Lashkar-e-Tayiba, Hezbolla, and Tablighi Jamaat.

Finally, Kohlmann would "opine on how he utilizes traditional forensic computer investigation techniques to track

-4-

terrorist websites." He also would "explain to the jury the significance and utility of the use of Internet Protocol ('IP addresses') and 'Whois' searches, among other things." He further would testify about his research into the IMC and the various email addresses and websites associated with it, including the email addresses and websites allegedly used by Kassir. The expert testimony described in this paragraph hereafter will be referred to as the "Forensic Computer Testimony."

On March 17, 2009, Kassir moved in limine to preclude Kohlmann's testimony. In general, Kassir argues that the subjects of Kohlmann's testimony do not require expert opinion because they are known to the layperson; that Kohlmann's opinion is based on insufficient facts and data and on an unreliable methodology; and that the prejudicial effect of his testimony would substantially outweigh its probative value.

The Government responded to the motion on March 27, 2009. Attached to the Government's brief is a transcript of a full-day Daubert hearing into Kohlmann's credentials and methodology as an expert on terrorism, conducted in another case on November 2, 2005 (the "Daubert Hrg. Tr."). See United States v. Paracha, No. 03 Cr. 1197 (SHS), 2006 WL 12768, *18-22 (S.D.N.Y. Jan. 3, 2006), aff'd, No. 06-3599-cr, 2008 WL 2477392 (2d Cir. June 19, 2008) (summary order). Neither side has

-5-

suggested that another <u>Daubert</u> hearing is necessary.

### Discussion

Federal Rule of Evidence 702 permits an expert to offer testimony in the form of an opinion if his or her "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," provided that "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

Under Rule 702, the court must determine whether an expert's opinion on the subject will "assist the trier of fact," or, in other words, be helpful to the jury. <u>See, e.g.</u>, <u>United States v. DiDomenico</u>, 985 F.2d 1159, 1163 (2d Cir. 1993). This helpfulness requirement calls for a "common sense inquiry into whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." <u>United States v. Locascio</u>, 6 F.3d 924, 936 (2d Cir. 1993) (internal quotation marks omitted); <u>United States v. Onumonu</u>, 967 F.2d 782, 788 (2d Cir. 1992). "Expert witnesses are often uniquely

-6-

qualified in guiding the trier of fact through a complicated morass of obscure terms and concepts." United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994). Therefore, in this regard, the "Rules of Evidence provide a liberal standard for the admissibility of expert testimony." United States v. Dukagjini, 326 F.3d 45, 52 (2d Cir. 2003).

In addition, the Supreme Court has instructed district courts to serve as "gatekeepers" and ensure that expert testimony "rests on a reliable foundation." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993); Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999); United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007). In order to gauge reliability, the district court must consider the criteria listed in Rule 702, namely, whether (1) the testimony is grounded on "sufficient facts or data;" (2) the testimony "is the product of reliable principles and methods;" and (3) "the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702; Wills v. Amerada Hess Corp., 379 F.3d 32, 48 (2d Cir. 2004). In Daubert, the Supreme Court enumerated other indicia of reliability that courts may consider: "(1) whether a theory or technique has been or can be tested; (2) 'whether the theory or technique has been subjected to peer review and publication;' (3) 'the technique's known or

potential rate of error' and 'the existence and maintenance of standards controlling the technique's operation;' and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community." Id. (quoting Daubert, 509 U.S. at 593-94). "The test of reliability is flexible, and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case." Kumho Tire, 526 U.S. at 141 (internal quotation marks omitted). The court's task is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Id. at 152.

Finally, like all evidence, expert testimony must be relevant. See Fed. R. Evid. 401; Daubert, 509 U.S. at 597 (stating that expert evidence must be "relevant to the task at hand"). Even if relevant, the testimony may be excluded under Rule 403 if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury." Fed. R. Evid. 403.

These issues—helpfulness, reliability, relevance, and Rule 403 balancing—are discussed in turn below.

-8-

A. Helpfulness

The Second Circuit repeatedly "has approved the admission of expert testimony in organized crime cases 'to help explain the operation, structure, membership, and terminology of organized crime families.'" United States v. Matera, 489 F.3d 115, 121-22 (2d Cir. 2007) (quoting Locascio, 6 F.3d 924, 936 (2d Cir. 1993); see also United States v. Amuso, 21 F.3d 1251, 1263-64 (2d Cir.1994); United States v. Tutino, 883 F.2d 1125, 1134 (2d Cir.1989); United States v. Daly, 842 F.2d 1380, 1388 (2d Cir. 1988). In Amuso, the Court concluded that these topics remain appropriate subjects for expert testimony despite the prevalence of organized crime stories in the news and popular media. 21 F.3d at 1264. "Aside from the probability that the depiction of organized crime in movies and television is misleading, the fact remains that the operational methods of organized crime families are still beyond the knowledge of the average citizen." Id.

Outside of the organized crime context, a number of courts have permitted expert testimony on the history, structure, leadership and methods of al Qaeda and other terrorist organizations. See United States v. Damrah, 412 F.3d 618, 625 (6th Cir. 2005); United States v. Hammoud, 381 F.3d 316, 337-38 (4th Cir. 2004)(en banc), vacated on other grounds

-9-

by 543 U.S. 1097 (2005), relevant portions reinstated by 405 F.3d 1034 (4th Cir. 2005) (en banc); United States v. Abu-Jihaad, 553 F. Supp. 2d 121, 124 (D. Conn. 2008); United States v. Abdi, 498 F. Supp. 2d 1048, 1069-70 (S.D. Ohio 2007); United States v. Aref, No. 04-CR-402, 2007 WL 603508, at *16 (N.D.N.Y. Feb. 22, 2007), aff'd, 285 Fed. Appx. 784, 2008 WL 2663348 (2d Cir. July 2, 2008) (summary order); United States v. Sabir, No. S4 05 Cr. 673 (LAP), 2007 WL 1373184, at *7-9 (S.D.N.Y. May 10, 2007); United States v. Paracha, 03 Cr. 1197 (SHS), 2006 WL 12768, *18-22 (S.D.N.Y. Jan. 3, 2006), aff'd, No. 06-3599-cr, 2008 WL 2477392 (2d Cir. June 19, 2008) (summary order).

In this case, Defendant argues that Kolhmann's expert testimony about al Qaeda is unnecessary. According to Defendant, widespread media coverage of al Qaeda since September 11, 2001, has brought it within the knowledge of ordinary jurors.

This very argument has been rejected by several district courts in this circuit. See Abu-Jihaad, 553 F. Supp. 2d at 124; Sabir, 2007 WL 1373184, at *8; Paracha, 2006 WL 12768 at *21-22. For example, in United States v. Paracha, the defendant was charged with conspiracy and attempt to provide material assistance to al Qaeda. The government sought to present Kohlmann as an expert witness on "al Qaeda's origin, leadership,

- 10 -

and operational structure." Id. at *21. The court admitted the testimony, finding that it would "aid the jury in understanding how al Qaeda came to be and the manner in which it currently functions." Id. The court further ruled that the testimony would "assist the jury in understanding the nature and functioning of the organization [defendant] is alleged to have assisted." Id. Rejecting defendant's argument that such expert testimony was unnecessary because information about al Qaeda already was known to the layperson, the court found that

> expert testimony about al Qaeda is appropriate despite its regular appearance in the popular media both because the media's depiction may be misleading and because some features of al Qaeda relevant to the allegations in this case remain "beyond the knowledge of the average citizen."

Id. at * 22 (quoting Amuso, 21 F.3d at 1264). This ruling was affirmed by the Court of Appeals in an unpublished opinion. United States v. Paracha, No. 06-3599-cr, 2008 WL 2477392 (2d Cir. June 19, 2008) (summary order) (holding that "the court was well within its discretion in ruling that Kohlmann's . . . testimony [was] relevant to the jury's understanding of al Qaeda so as to be admissible"); see also Sabir, 2007 WL 1373184 at *8 (adopting the reasoning in Paracha and permitting Kohlmann to testify as an expert on the same topics); Abu-Jihaad, 553 F.

-11-

Supp. 2d at 124 (admitting Kohlmann's expert testimony and stating that, "[d]espite the relatively widespread news coverage of al Qaeda and other terrorist organizations, the operations of al Qaeda . . .are still beyond the knowledge of ordinary jurors").

The result is no different in this case. Although al Qaeda has become a household name, it remains true that some depictions of it on television, in the movies, and perhaps even in the national news may be misleading. Furthermore, many of al Qaeda's operational methods relevant to the charges in this case may not be known to the layperson. For example, Kohlmann will testify about the use and importance of jihad training camps to al Qaeda. This testimony would help the jury appreciate how a camp set up in Bly, Oregon could materially assist al Qaeda. Likewise, Kohlmann's testimony about the use of the internet by al Qaeda to distribute recruiting and training materials would aid the jury in determining whether the websites allegedly operated by Kassir provided material assistance.

Defendant also claims that al Qaeda's leader, bin Laden, is well known to the public, and that the leadership structure below him is irrelevant to this case. This is not so. The Government represents that it will introduce evidence of terrorist propaganda, allegedly seized from Kassir's computer,

containing images of al Qaeda leaders whom the jury would not recognize. Expert testimony identifying these individuals and their role in al Qaeda would place this evidence into context and help the jury understand its relevance to the charges.

In addition, the jury will unlikely be familiar with the lesser-known terrorist organizations about which Kohlmann would testify, like Lashkar-e-Tayiba, Hezbolla, and Tablighi Jamaat. Finally, the Forensic Computer Testimony clearly is beyond the ken of the average juror, so expert testimony on this subject would be appropriate.

Therefore, the Court finds that the origins, history, structure, leadership and operational methods of al Qaeda and other terrorist groups, as well as the Forensic Computer Testimony, is an appropriate subject of expert testimony. As discussed below, however, a Daubert hearing will be necessary to in order to determine Kohlmann's qualifications to offer the Forensic Computer Testimony.

B. Reliability

Kolhmann began studying terrorism at Georgetown University, where he earned an undergraduate degree in international politics with a concentration in international security studies and a minor in Islamic studies. (Daubert Hrg.

- 13 -

Tr. at 11-19.) While there, he researched topics including the origins of the Taliban, al Qaeda, and other terrorist groups. (Id.) He then attended the University of Pennsylvania, where he earned a juris doctorate degree and also took graduate courses on national security and terrorism. (Id. at 19-20.) From 1998-2004, he worked as a counterterrorism consultant at a think-tank in Washington, D.C. (Id. at 21-23.) Since then, he has operated a website called globalterroralert.com, a clearinghouse of open source information on terrorism that he has collected in the course of his research. (Id. at 29.) His book about al Qaeda in Europe is cited in the 9-11 Commission's Report, and he has published many peer-reviewed articles and book chapters on various aspects of terrorism. (Id. at 38-48.) He has provided consulting services to various governmental agencies and spoken at academic conferences around the world. (Id. at 27-29, 48-52). In addition, he has testified as a terrorism expert in eleven federal trials, two military commission trials held in Guantanamo Bay, Cuba, and at Scotland Yard and the Hague. (Id. at 72-72; Kohlman CV.)

Kohlmann explained that his methodology consists of gathering multiple sources of information, including original and secondary sources, cross-checking and juxtaposing new information against existing information and evaluating new information to determine whether his conclusions remain

-14-

consonant with the most reliable sources. (Id. at 73-76). He describes his work as a study of the micro-history of al Qaeda and its involvement in regional conflicts (Id. at 76). His methodology is similar to that employed by his peers in his field. (Id.) He works collaboratively with his peers, gathering additional information and seeking out and receiving comments on his own work. (Id. at 76-77).

Defendant argues that (1) Kohlmann's proposed testimony is not based upon sufficient facts or data, (2) his methodology is unreliable because it is not readily subject to testing and amounts to a cherry-picking of information and websites and other sources, and (3) his knowledge is based in large part on hearsay.

Again, courts in this circuit have rejected these same arguments. See Abu-Jihaad, 553 F. Supp. 2d at 124; Sabir, 2007 WL 1373184, at *-9; Paracha, 2006 WL 12768 at *20-21. In Paracha, the court found that Kohlmann "possesses sufficient education, training and experience to qualify as an expert on the origins, leadership and tradecraft of the al Qaeda organization." Paracha, 2006 WL 12768 at *20. The court then ruled that

> Although Kohlmann's methodology is not
> readily subject to testing and permits of no
> ready calculation of a concrete error rate,
> it is more reliable than a simple cherry-
> picking of information from websites and

-15-

>other sources. The testimony and evidence at the [Daubert] hearing demonstrate that Kohlmann's opinions and conclusions are subjected to various forms of peer review and that the opinions he proposes to offer here regarding al Qaeda's origins, leaders and certain tradecraft are generally accepted within the relevant community. Kohlmann's methodology, as he describes it, is similar to that employed by experts that have been permitted to testify in other federal cases involving terrorist organizations.

Id. (citations omitted). Finally, the Paracha court found that Kohlmann's reliance in part on secondary sources of information was permissible because other experts in his field reasonably relied on them, "similarly to law enforcement officers who offer expert testimony on the workings of criminal organizations." Id. at *21; see also United States v. Damrah, 412 F.3d 618, 625 (6th Cir. 2005) (holding that district court did not abuse its discretion in allowing expert testimony based on, inter alia, books, press releases, and newspaper articles and quoting the district court's opinion that "[g]iven the secretive nature of terrorists, the Court can think of few other materials that experts in the field of terrorism would rely upon"). Paracha's rulings were affirmed on appeal and have been adopted by other courts. United States v. Paracha, No. 06-3599-cr, 2008 WL 2477392 (2d Cir. June 19, 2008) (summary order) (holding that the district court "was well within its discretion in ruling that Kohlmann's methodology was sufficiently reliable . . . so

- 16 -

as to be admissible under [Rule] 702 and Daubert"); Abu-Jihaad, 553 F. Supp. 2d at 124; Sabir, 2007 WL 1373184, at *11; United States v. Aref, 285 Fed. Appx. 784, 2008 WL 2663348 (2d Cir. July 2, 2008) (summary order) (holding that it was no abuse of discretion for the district court to qualify Kohlmann as an expert on terrorist groups).

Kohlmann's expertise and reliability have not diminished, and the standard under Rule 702 and Daubert remains the same. Therefore, his testimony on the origins, history, structure, leadership and various operational methods of al Qaeda and other terrorist groups is sufficiently reliable.

The present record does not establish Kohlmann's qualifications to offer the Forensic Computer Testimony, however. The Daubert hearing conducted in Paracha revealed that he operates an online clearinghouse of terrorism-related information and that he is proficient in internet research. However, the hearing did not probe his expertise on such topics as "traditional forensic computer investigation techniques to track terrorist websites." Neither side has addressed this issue. Nonetheless, it remains the Government's burden to establish the qualifications of its expert, just as it remains the Court's duty to serve as a gatekeeper. Therefore, a Daubert hearing limited to this issue will be held at 2:30 p.m. on April 9, 2009.

C. Relevance and Rule 403 balancing

   1. *Expert Testimony about al Qaeda*

Kohlmann's testimony about the origins, history, structure, leadership, and operational methods of al Qaeda is relevant to the jury's determination of whether Kassir provided material assistance to that terrorist organization. Kassir argues that expert testimony about al Qaeda's leadership, particularly about Usama bin laden, is highly inflammatory and should be excluded under Rule 403. As mentioned above, the Government will offer evidence that Kassir's computer contained pieces of terrorist propaganda containing photographs of al Qaeda leaders, including bin Laden. Expert testimony identifying the persons in the photographs as leaders of al Qaeda will be highly probative (JFK) and will not be unfairly prejudicial.

   2. *Expert Testimony about other terrorist organizations*

Defendant argues that expert testimony about the Taliban also should be excluded under Rule 403 because it is highly inflammatory. The Court reserves decision on this issue. Defendant has filed a separate motion in limine to exclude all evidence of other terrorist groups, on the ground that such evidence is irrelevant and unfairly prejudicial. Whether

- 18 -

Kohlmann may offer expert testimony on this topic will depend on the outcome of that motion.

### 3. *Forensic Computer Testimony*

Testimony linking the IMC to various email addresses and websites allegedly operated by Defendant would be relevant and would not be unfairly prejudicial. As ruled above, however, a Daubert hearing is necessary to determine whether Kohlmann is qualified to testify as an expert on this subject.

### Conclusion

This constitutes the Court's ruling on Defendant's motion to exclude the testimony of the Government's expert witness.

**SO ORDERED.**

**Dated:** **New York, NY**
**April 2, 2009**

_____
JOHN F. KEENAN
United States District Court