UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------- X
UNITED STATES OF AMERICA          :
                                  :
        -against-                 :
                                  :   **OPINION & ORDER**
OUSSAMA KASSIR,                   :   04 Cr. 356 (JFK)
     a/k/a "Abu Abdullah,"        :
     a/k/a "Abu Khadija,"         :
                                  :
                    Defendant.    :
--------------------------------- X

**JOHN F. KEENAN, United States District Judge:**

Before the Court is convicted Defendant Oussama Kassir's ("Defendant" or "Kassir") motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure or, alternatively, for a new trial pursuant to Rule 33. For the reasons that follow, the motion is denied.

## I.  BACKGROUND

At trial, the Government offered evidence in support of two sets of charges against Defendant. First, the Government offered evidence that Kassir trained young men for jihad in the Pacific Northwest at both a Seattle mosque and a camp site in Bly, Oregon (the "Jihad Training Charges"). For this conduct, Kassir was charged with conspiracy to provide and conceal material support and

resources to terrorists, 18 U.S.C. § 2339A (Count One[1]); providing and concealing material support and resources to terrorists, 18 U.S.C. § 2339A (Count Two); conspiracy to provide material support and resources to a foreign terrorist organization, 18 U.S.C. § 2339B (Count Three); providing material support and resources to a foreign terrorist organization, 18 U.S.C. § 2339B (Count Four); conspiracy to kill, kidnap, maim, and injure persons in a foreign country, 18 U.S.C. § 956(a) (Count Five).

Second, the Government offered evidence that, after leaving the United States and returning to Sweden, where he is a citizen, Kassir operated a network of terrorist websites known as the "Islamic Media Center" ("IMC"), which distributed jihadi propaganda and instructions on how to build bombs and manufacture poisons, among other things (the "Terrorist Websites Charges"). For this conduct, Kassir was charged with conspiracy to provide and conceal material support and resources to terrorists, 18 U.S.C. § 2339A (Count Six); providing and concealing material support and resources to terrorists, 18 U.S.C. § 2339A (Count Seven); conspiracy to provide material support and

---

[1] The Court refers to the redacted version of the second superseding indictment, i.e., the indictment marked "S2 04 Cr. 356 (JFK)(R2)." The redacted version removed all charges unrelated to Kassir and renumbered the remaining counts.

resources to a foreign terrorist organization, 18 U.S.C. §
2339B (Count Eight); providing material support and
resources to a foreign terrorist organization, 18 U.S.C. §
2339B (Count Nine); conspiracy to kill, kidnap, maim, and
injure persons in a foreign country, 18 U.S.C. § 956(a)
(Count Ten); distributing information relating to
explosives, destructive devices, and weapons of mass
destruction, 18 U.S.C. § 842(p)(2)(A) (Count Eleven).[2]

During the three-week trial, the Government offered
extensive evidence in support of both sets of charges. The
Court discusses the evidence only insofar as it is relevant
to this decision.

In support of the Jihad Training Charges, the
Government called cooperating witness James Ujaama
("Ujaama"), a U.S. citizen. Ujaama testified that he was
the one who initially came up with the idea of starting a
jihad training camp in Bly, Oregon. (Tr.[3] 1281:11-13.) He
further testified that, in creating the camp, he conspired
with Kassir; Abu Hamza, a British imam; Haroon Aswat
("Aswat"), Kassir's travel companion to the Pacific
Northwest; and Semi Osman, a Seattle-based imam. Ujaama

---

[2] At trial, the Government dismissed one count of
providing assistance and inducement in the development,
production, and use of chemical weapons in violation of 18
U.S.C. § 229(a) (Count Twelve).
[3] "Tr." refers to the trial transcript.

stated that Kassir's role was to be that of "the trainer." (Id. at 1281:7-10, 1281:14-17.)   According to Ujaama, Kassir admitted as much shortly after arriving in the Pacific Northwest:

> Q.  Did Mr. Kassir say anything to you at any point in Seattle-Tacoma or in the Bly ranch as to what his intentions were for the Bly property?
> A.  Yes, sir.
> Q.  What did he tell you?
> A.  He told me that Abu Hamza had sent him, and that he asked me about the recruits.
> Q.  Did he say why Abu Hamza had sent him?
> A.  Yes, sir.  He had mentioned the jihad training for the recruits.

(Id. at 1331:2-11.)   Ujaama testified that he was upset when he learned that Abu Hamza had shared his idea of starting a training camp with Kassir (id. at 1335:7-17, 1463:6-1464:14.), and stated that, as a general matter, he disliked Kassir (id. at 1448:17-1451:19).   According to Ujaama, disagreements between him and Kassir eventually drove Ujaama to leave the Bly training camp and, later, the Seattle area as well. (Id. at 1332:21-25, 1336:9-1338:4.) Ujaama also stated at one point that he intended his conduct to provide support only to the Taliban, as opposed to any other group such as al Qaeda. (Id. at 1523:24-1524:7.)

4

The Government corroborated much of Ujaama's testimony with physical evidence and the testimony of other witnesses.  First, the Government introduced as evidence a fax that Ujaama sent to Abu Hamza on October 25, 1999, in which Ujaama outlined his idea for the Bly training camp and stated that he was "expecting the two brothers that we discussed to come in November." (Id. at 1318:9-12; Gov't's Ex. 624.)  The Government then offered evidence showing that Kassir and Aswat arrived in the United States that November (id. at 1631:8-1632:17), and that Kassir had a copy of Ujaama's fax (id. at 933:12-14, 1034:13-22, 1335:7-9).  Second, the Government called Ayat Hakima – the wife of the owner of the Bly camp property – and Angelica Osman – Semi Osman's wife – both of whom testified that Kassir admitted in their presence that Abu Hamza had sent him to Bly to train people for jihad. (Id. at 929:15-930:12, 1033:15-18, 1053:3-17.)  Third, the Government called Jabari Anderson and Nathan Bishop, one-time members of the Seattle mosque, who testified that Kassir provided hand-to-hand combat and weapons training – such as how to modify an AK-47 to launch a grenade – at the mosque and had encouraged his trainees to engage in terrorist acts. (Id. at 1217:12-1218:11; 1567:1-1568:15.)

The Government also offered evidence linking this jihad training to al Qaeda.  According to Nathan Bishop, Kassir explained that the training was the "first lesson that every mujahid [holy warrior] needs to know . . . [i]f you ever go up or get to go up to the mountains." (Id. 1210:10-15.)  Bishop explained that he understood "going up to the mountains" to be a reference to "the mountains of Afghanistan or Kashmir or maybe to Afghanistan [sic]." (Id. at 1210:16-19.)  As the Government's terrorism expert, Evan Kohlman ("Kohlman"), explained, at that time in Afghanistan, the Taliban and al Qaeda were jointly fighting against the Northern Alliance. (Id. at 732:21-733:19.)  The Government also read a stipulation indicating that Aswat, Kassir's travel companion, signed a ledger in an al Qaeda safe house in Karachi, Pakistan, that contained the fingerprints of al Qaeda's chief operational planner, Khalid Sheik Mohammed. (Id. at 984:10-985:16.)

In support of the Terrorist Websites Charges, the Government offered evidence showing that the IMC distributed jihadi training materials, such as the Mujahideen Explosives Handbook, the Mujahideen Poisons Handbook, and Muskar.doc, a manual on how to run a terrorist training camp.  Kohlman explained how the dissemination of these materials benefitted al Qaeda:

6

Q.   How can a document like [Muskar.doc]
posted on the Internet help al Qaeda?

A.    Again, al Qaeda is not just an
organization.  Al Qaeda also views itself as
an ideology.  It hopes to encourage people
around the world who are unable to travel to
places like Afghanistan or Somalia or
wherever else, it hopes to encourage those
people to do what they can at home.

Particularly after 9/11, there was a
tremendous emphasis on the training camps
are closed [sic].  You can't just come to
Afghanistan now to get training and go home.
Now the battle is in your own backyard.  The
battle is what you yourself are able to do
with your own abilities, so you should do
whatever you can.  It is an individual duty
upon you to participate in the struggle.  It
is not about Usama Bin Laden and it's not
about al Qaeda.  It is about the methodology
and the ideology behind them.  If you follow
the same methodology and the same ideology,
then you too can be al Qaeda.

These people that are out there are often
in countries where this kind of training is
not widely available to them or at least
these kind of instructional manuals are not
widely available.  The idea behind
distributing a manual like this is to allow
homegrown individuals to self-radicalize and
train themselves for their own missions.

That's exactly the way that these
documents have been used.  They turn up on
people's computers who are arrested in the
United Kingdom and here [in] the United
States who aspire to become terrorists.  Not
all of these people are al Qaeda members.
Very frequently they're not.  But, they want
to become that.  And they are willing to
carry out acts of violence in the name of al
Qaeda, even on their own, and they perceive
that they can get there by following these
manuals.

(Id. at 815:2-816:7.)

The Government then offered evidence linking Kassir to the IMC.   Special Agent Philip Swabsin ("Special Agent Swabsin") testified that the "slack space" on Kassir's computers – that is, data that was deleted but not permanently so – demonstrated that Kassir regularly used the e-mail addresses khadija1417@hotmail.com and zubeiddah1417@hotmail.com.   (Id. at 1948:11-24, 1951:12-1952:6, 1953:2-17.)   According to Kohlman, these e-mail addresses appeared on much of the propaganda distributed through IMC. (Id. at 787:15-788:8.)

Special Agent Swabsin solidified the link through business records from Internet service providers that showed that the e-mail addresses were used to create many of the IMC websites, such as uddat.8k.com. (Id. at 1882:15-21, 1893:4-9.)   The slack space of Kassir's computers also contained jihadi materials similar or identical to those found on the IMC websites.   For example, Special Agent Swabsin stated that his search of Kassir's computers revealed a video clip of members of "al-Qaeda, al-jihad group in Iraq" executing a masked hostage (id. at 1902:21-1904:10), and an image of Usama bin Laden and Dr. Ayman al-Zawahiri featuring the IMC logo and the Arabic phrase "I swear by almighty God America will not enjoy security" (id. at 1981:14-1982:9).

To show that Kassir had co-conspirators for the Terrorist Websites Charges, the Government offered testimony that people other than Kassir had access to the IMC e-mail accounts and websites. Special Agent Swabsin testified that, during his investigation of the IMC, he discovered that people were accessing one of the IMC e-mail accounts from Internet protocol ("IP") addresses that resolved to countries other than Sweden, where Kassir lived at the time. (Id. at 2003:3-14.) Special Agent Swabsin concluded from this "that more than one person was attempting to access that e-mail account." (Id. at 2003:15-17.) During cross-examination, Special Agent Swabsin also testified that a number of the IMC websites were updated at times that Kassir was incarcerated and without access to the Internet. (Id. at 2047:16-2058:23.) Finally, the Government introduced documents downloaded from the IMC authored by people other than Kassir, some of which contained statements thanking Kassir for his assistance.[4] (Id. at 808:2-803:1, 814:17-815:2, 1934:15-1935:17)

After completion of the trial, the jury found Kassir guilty on all twelve counts.

## II.  DISCUSSION

_____

[4] Generally, the thanks were given to "Abu Khadija" (see, e.g., Tr. 814:17-815:2), an alias that Kassir used frequently (see, e.g., Tr. 1560:1-1561:12).

Kassir sets forth three general arguments: (1) The evidence at trial was insufficient to establish the existence of a knowing agreement between Kassir and his alleged co-conspirators, an element of Counts One, Three, Five, Six, Eight, and Ten. (2) The evidence at trial was insufficient to establish that he provided material support or resources to al Qaeda, an element of Counts Two, Four, Seven, and Nine, charging Kassir with violations of 18 U.S.C. §§ 2339A and 2339B. (3) Kassir's convictions for violations of 18 U.S.C. § 2339B are unconstitutional on the ground of vagueness.[5]

### A.   Legal Standard

#### 1.   Federal Rule of Criminal Procedure 29

"[T]he court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. However, defendants have to carry "a heavy burden" to obtain such relief. United States v. Desena, 260 F.3d 150, 154 (2d Cir. 2001). Specifically, "The verdict will be sustained unless no rational trier of fact could have found the essential elements of the crime beyond a reasonable

---

[5] None of Kassir's arguments challenge his conviction for distributing information relating to explosives, destructive devices, and weapons of mass destruction, in violation of 18 U.S.C. § 842(p)(2)(A) (Count Eleven).

doubt." United States v. Zagari, 111 F.3d 307, 327 (2d Cir. 1997) (internal quotation marks omitted).   When considering a Rule 29 motion, the court must view the evidence "in the light most favorable to the government." Id.; accord United States v. Abelis, 146 F.3d 73, 80 (2d Cir. 1998) ("We view the evidence as a whole in the light most favorable to the government, drawing all inferences and resolving all issues of credibility in the government's favor." (internal quotation marks omitted)).   In determining whether there was sufficient evidence to support the verdict, "the court must be careful to avoid usurping the role of the jury." United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999).   In other words, the court may not "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." Id.

This "standard of deference is especially important when reviewing a conviction of conspiracy." United States v. Pitre, 960 F.2d 1112, 1121 (2d Cir. 1992).   "This is so because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." Id. (internal quotation marks omitted).   As a result, "the existence of and participation

11

in a conspiracy may be established through circumstantial evidence." Id.   "However, there must be some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." United States v. Gaviria, 740 F.2d 174, 183 (2d Cir. 1984).   "[O]nce a conspiracy is shown to exist, the evidence sufficient to link another defendant to it need not be overwhelming." United States v. Casamento, 887 F.2d 1141, 1156 (2d Cir. 1989).

### 2.   Federal Rule of Criminal Procedure 33

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).   "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." United States v. Ferguson, 246 F.3d 129, 133-34 (2d Cir. 2001).    In essence, "[t]here must be a real concern that an innocent person may have been convicted." United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992).   "Although a trial court has broader discretion to grant a new trial pursuant to Rule 33 than to grant a motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29, . . . that discretion should be exercised sparingly." Id.

## B.  Application

### 1.  Evidence of Conspiracy

Kassir argues that there was insufficient evidence to establish the existence of a knowing agreement between him and his alleged co-conspirators – a necessary element of all the conspiracy counts in the Jihad Training Charges (Counts One, Three, and Five) and the Terrorist Websites Charges (Counts Six, Eight, and Ten).  Regarding the Jihad Training Charges, Kassir contends that his arrival in the United States with Aswat shortly after Ujaama sent his fax to Abu Hamza merely constitutes a "suspicious circumstance[]." (Def.'s Mem. 6.)  Kassir submits that a suspicious circumstance of this kind is insufficient to prove Kassir's knowing participation in the conspiracy. Kassir further argues that the fact that Ujaama was angry that Kassir learned about his plans for Bly, had disputes with Kassir, and eventually left the area indicates that Kassir was not a part of any conspiracy hatched by Ujaama. Finally, Kassir points to Ujaama's testimony that he intended the camp to support the Taliban as opposed to Al Qaeda as evidence that there was no actual agreement between Kassir and Ujaama.

Kassir ignores the substantial evidence from which the jury could permissibly conclude that he knowingly

participated in the jihad training conspiracy. First, Ujaama's testimony that Kassir admitted that he had been sent by Abu Hamza to conduct jihad training is by itself sufficient to support the jury's verdict. See United States v. Gordon, 987 F.2d 902, 906 (2d Cir. 1993) ("A conviction may be sustained on the basis of the testimony of a single accomplice, so long as that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt."). The jury need not have relied solely on Ujaama's say-so, however, since there was strong corroborating evidence in the form of the fax Ujaama sent to Abu Hamza, which Kassir brought with him to the Pacific Northwest; the testimony of Ayat Hakima and Angelica Osman, who also heard Kassir admit that Abu Hamza had sent him to conduct jihad training; and the testimony of Jabari Anderson and Nathan Bishop, who described the kind of training Kassir willingly provided them.

The strength of the evidence against Kassir distinguishes this case from those built on mere "suspicious circumstances." See, e.g., United States v. Tyler, 758 F.2d 66, 69 (2d Cir. 1985) (finding insufficient evidence of a conspiracy where defendant introduced a willing drug buyer to a willing drug seller); United States v. Young, 745 F.2d 733, 764 (2d Cir. 1984) (finding

insufficient evidence that Defendant knowingly entered conspiracy where she possessed a firearm, had some unexplained wealth, and associated with members of conspiracy); United States v. Gaviria, 740 F.2d 174, 184 (2d Cir. 1984) (finding defendant's association with members of a conspiracy and presence in a car containing drugs insufficient to show knowing participation). Unlike those cases, here there is ample evidence that Kassir was aware of the conspiracy and was a knowing, active participant.

Kassir's other arguments are equally unavailing. Although Ujaama and Kassir had a number of disagreements during the course of the conspiracy, it was within the jury's discretion to conclude that these did not rise to the level of nullifying the conspiracy itself. And even though Ujaama may not have intended to support al Qaeda, there was sufficient evidence for the jury to conclude that Kassir and his other co-conspirators had this intent: Kassir stated that the training he provided was the "first lesson" for those who would go "up into the mountains," a reference to fighting under the Taliban and al Qaeda in Afghanistan; and after attending training sessions led by Kassir, Aswat actually did travel to that region of the

world where he at one point stayed in an al Qaeda safe house.

Regarding the Terrorist Websites Charges, Kassir does not dispute the sufficiency of the evidence linking him with the IMC, but argues that there is no evidence that he had any co-conspirators.  He takes issue with Special Agent Swabsin's conclusion that people other than Kassir collaborated on the IMC because the relevant e-mails and websites were accessed from IP addresses outside of Sweden.  Kassir notes that Kohlman undercut Special Agent Swabsin's conclusion when he stated that it is possible to disguise the location and identity of one's IP address.

Kassir's argument is unpersuasive.  Although it is potentially possible that Kassir disguised his own IP address to make it appear that an IMC e-mail account was accessed from outside of Sweden, the jury was not required to reach this conclusion or to reject alternative explanations. See United States v. Best, 219 F.3d 192, 200 (2d Cir. 2000) ("The government's proof need not exclude every possible hypothesis of innocence, and where there are conflicts in the testimony, we defer to . . . the jury's choice of the competing inferences that can be drawn from the evidence." (citations and internal quotation marks omitted)).  Furthermore, Kassir's argument fails to address

16

other evidence that he had co-conspirators in maintaining the IMC.   For example, individuals other than Kassir updated the IMC websites while he was incarcerated and without Internet access, and people other than Kassir prepared certain IMC documents and, in some of those documents, thanked Kassir for his assistance.

The Court finds that there was sufficient evidence to sustain a conviction against Kassir for all of the conspiracy counts.   Further, the Court finds that allowing these convictions to stand would not be a manifest injustice.   Therefore, the Court denies Kassir's motion under Rule 29 and Rule 33 on the conspiracy counts.

### 2.   Providing Material Support and Resources

Kassir argues that there is insufficient evidence to support his conviction for providing material support or resources to al Qaeda in violation of 18 U.S.C. §§ 2339A and 2339B for both the Jihad Training Charges (Counts Two and Four) and the Terrorist Websites Charges (Counts Seven and Nine).   18 U.S.C. § 2339A reads,

> Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of [18 U.S.C. § 956 (conspiracy to kill, kidnap, maim, or injure persons or damage property in a foreign country), among

other statutes] . . . or attempts or conspires to do such an act, shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life.

18 U.S.C. § 2339B reads,

Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization . . . , that the organization has engaged or engages in terrorist activity (as defined in . . . [8 U.S.C. § 1182(a)(3)(B)]), or that the organization has engaged or engages in terrorism (as defined in . . . [22 U.S.C. § 2656f(d)(2)]).

Both statutes define "material support or resources"

the same way:

[A]ny property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. §§ 2339A(b)(1), 2339B(g)(4). They further define

"training" as "instruction or teaching designed to impart a

specific skill, as opposed to general knowledge," 18 U.S.C.

§ 2339A(b)(2), and "expert advice or assistance" as "advice or assistance derived from scientific, technical or other specialized knowledge," 18 U.S.C. § 2339A(b)(3).

Kassir argues as a preliminary matter that there was insufficient evidence that he knew that al Qaeda was a terrorist organization or engaged in terrorist activity, a necessary element of 18 U.S.C. § 2339B. The Court rejects this argument. The jury could permissibly conclude from the materials found on Kassir's computer – such as the image of Usama bin Laden above the phrase "America shall not enjoy security" and the clip of members of al-Qaeda al-Jihad in Iraq executing a hostage – that Kassir knew al Qaeda has engaged in terrorist activity.

Kassir's primary argument is that there is insufficient evidence that he provided "material support or resources" to al Qaeda. As to the Jihad Training Charges, he argues that the Government failed to link the support he provided to the underlying goal of the conspiracy, namely, to murder, maim, or kidnap people overseas. He also notes that none of the jihad trainees called by the Government to testify believed that they were being trained with a view toward aiding al Qaeda. These arguments fall in the face of Kassir's allusions to "going up in the mountains" and Aswat's traveling to an al Qaeda safe house in Pakistan.

19

This not only tied Kassir to a conspiracy to harm people overseas but it allowed the jury to infer that Kassir intended the jihad training to benefit al Qaeda.

Kassir next argues that even before he arrived in the Pacific Northwest, members of the Seattle mosque had engaged in weapons and combat training. He further claims that, lacking specialized training himself, he could only impart general knowledge, which 18 U.S.C. 2339B expressly does not prohibit. 18 U.S.C. § 2339A(b)(2). However, Kassir overlooks the evidence that he provided specific specialized training – such as how to modify an AK-47 to launch grenades – to mosque members like Nathan Bishop and Jabari Anderson who had no prior training of this kind.

As to the Terrorist Websites Charges, Kassir argues that his role falls short of providing material support or resources to al Qaeda.[6] He notes that the IMC training materials were available elsewhere on the Internet, suggesting (apparently) that they therefore should not be

---

[6] Kassir also appears to question whether there is sufficient evidence that he played <u>any</u> role at all in running the IMC, noting that there was no direct evidence that he used the computers linked to the IMC websites and e-mail accounts. This observation is legally irrelevant, however. Convictions are permitted to rest on circumstantial evidence, <u>see</u> <u>Pitre</u>, 960 F.2d at 1121, and there was a great deal of such evidence tying Kassir to these computers: for starters, they were recovered from Kassir's person and home and at least one of them contained images of Kassir handling weapons. (<u>Id.</u> at 1974:7-14.)

considered "expert advice or assistance" or "training." The Court need not consider the dubious legal foundation for this argument since it is inconsistent with Kohlman's testimony, which the Court accepts as true for the purposes of this motion. See Abelis, 146 F.3d at 80.  Kohlman testified that the training materials provided through the IMC were actually not available elsewhere on the Internet at the time of the offense:  "I only know of one organization that had most of the materials that came out from the IMC, and that was the IMC." (Tr. 848:12-14.)

Kassir also argues that, even if the training manuals distributed through the IMC do qualify as "expert advice or assistance" or "training," there is insufficient evidence that the IMC provided them to al Qaeda, specifically. Kohlman directly contradicted this claim, however.  The import of his testimony was that IMC manuals "turn[ed] up" on the computers of terrorists arrested in the United Kingdom and the United States, some of whom were members of al Qaeda. (Tr. at 816:1-816:7.)

There was sufficient evidence for the jury to conclude that Kassir provided material support and resources to al Qaeda both by training young men in the Pacific Northwest for jihad and by distributing training manuals through the IMC.  This conduct falls firmly under the definition of

providing "training" or "expert advice or assistance" as defined by 18 U.S.C. §§ 2339A and 2339B.  The Court further finds that allowing the material support convictions to stand would not be a manifest injustice.  Kassir's motion on these counts is denied.

### 3.  Vagueness Challenge to 18 U.S.C. § 2339B

Kassir's final argument is that his convictions for conspiracy to violate 18 U.S.C. § 2339B (Counts Three, Four, Eight, and Nine) are constitutionally infirm. Specifically, Kassir argues that the statute is unconstitutionally vague as applied in this case.

Courts evaluate as applied vagueness challenges under a two-part test:  "[The court must] first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and [second] consider whether the law provides explicit standards for those who apply it." Linares Huarcaya v. Mukasey, 550 F.3d 224, 231 (2d Cir. 2008).  However, when a statute is judged on an as applied basis, "one whose conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness." United States v. Nadi, 996 F.2d 548, 550 (2d Cir. 1993); see also Thibodeau v. Portuondo, 486 F.3d 61, 69 (2d Cir. 2007) ("Even assuming, arguendo, that the statute did not provide

sufficient   objective,   explicit   criteria   to   prevent
arbitrary   enforcement,   the   statute   as   applied   to
[defendant] would not be unconstitutionally vague because
the conduct to which the statute was applied falls within
the 'core meaning' of the statute.").

Kassir's as applied vagueness challenge fails since 18
U.S.C.   §   2339B   clearly   applied   to   Kassir's   conduct.
Knowingly   providing   jihad   training   to   young   men   and
disseminating   training   manuals   online   for   the   benefit   al
Qaeda   implicates   the   "core   meaning"   of   a   statute   that
proscribes   knowingly   providing   "training"   and   "expert
advice or assistance" to a foreign terrorist organization.
Cf. United States v. Warsame, 537 F. Supp. 2d 1005, 1018
(D. Minn. 2008) (rejecting vagueness challenge to 18 U.S.C.
§ 2339B, finding that "the alleged participation in an Al
Qaeda training camp is unambiguously encompassed within the
plain   meaning"   of   the   statute).     The   Court   therefore
rejects Kassir's as applied vagueness challenge.

To   the   extent   Kassir's   vagueness   challenge   can   be
construed as a facial challenge, the Court finds it equally
meritless.     Courts   entertaining   a   facial   vagueness
challenge   first   "must   determine   whether   the   challenged
statute 'reaches a substantial amount of constitutionally
protected conduct.'" United States v. Shah, 474 F. Supp. 2d

23

492, 496 (S.D.N.Y. 2007) (quoting <u>Kolender v. Lawson</u>, 461 U.S. 352, 358 n.8 (1983)).   Courts have uniformly found that 18 U.S.C. § 2339B does not reach such conduct. <u>See, e.g.</u>, <u>Humanitarian Law Project v. Reno</u>, 205 F.3d 1130, 1134-36 (9th Cir. 2000) (finding that 18 U.S.C. § 2339B does not impose guilt by association or criminalize advocacy); <u>United States v. Taleb-Jedi</u>, 566 F. Supp. 2d 157, 183-84 (E.D.N.Y. 2008) ("§ 2339B does not reach a substantial amount of constitutionally protected speech or association to warrant invalidation because the statute does not prohibit mere membership or association and only criminalizes the conduct of providing material support or resources to designated FTOs."); <u>United States v. Shah</u>, 474 F. Supp. 2d 492, 499 (S.D.N.Y. 2007); <u>United States v. Assi</u>, 414 F. Supp. 2d 707, 719 (E.D. Mich. 2006).   This Court concurs.[7]

_____

[7] Although, as in the instant case, the statute can criminalize the distribution of certain written materials, this does not mean the statute reaches constitutionally protected speech. <u>See</u> <u>Giboney v. Empire Storage & Ice Co.</u>, 336 U.S. 490, 499 (1949) ("It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute.   We reject the contention now."); <u>see also</u> <u>Rice v. Paladin Enters.</u>, 128 F.3d 233, 244 (4th Cir. 1997) (citing Laurence H. Tribe, American Constitutional Law 837 (2d ed. 1988) ("The law need not treat differently the crime of one man who sells a bomb to terrorists and that of another who

Since 18 U.S.C. § 2339B does not reach a substantial amount of constitutionally protected conduct, Kassir can only sustain his facial vagueness challenge if he "'demonstrate[s] that the law is impermissibly vague in all of its applications.'" Farrell v. Burke, 449 F.3d 470, 496 (2d Cir. 2006) (quoting Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 496 (1982)). Kassir cannot do so for the simple reason that, as explained above, the statute is not impermissibly vague as applied to him. See United States v. Assi, 414 F. Supp. 2d 707, 719 (E.D. Mich. 2006) (employing identical logic); see also id. (holding that "the statute could not be viewed as impermissibly vague in cases where the 'material support' took the form of . . . false documentation or explosives").

Although the above case law compels the Court to reject Kassir's vagueness challenge, the Court briefly considers two additional arguments that Kassir sets forth. First, Kassir argues that the Government's witnesses created a vagueness problem by defining the term "jihad" in such a way that it included legal activities. Kassir fails to explain, however, how this renders vague a statute that

---

publishes an instructional manual for terrorists on how to build their own bombs out of old Volkswagen parts.")).

never uses the term "jihad." He argues that the Government's witnesses created a second vagueness problem by defining al Qaeda in such a way that Kassir could be convicted under 18 U.S.C. § 2339B simply for sharing al Qaeda's ideology or taking actions that, by coincidence, al Qaeda sanctions. Even assuming arguendo that this is true, the evidence in this case demonstrated that Kassir did more than simply share al Qaeda's ideology and that it was no accident that his actions benefitted al Qaeda. Therefore, these problems are hypothetical and, as such, do not change the Court's analysis. See Perez v. Hoblock, 368 F.3d 166, 175 (2d Cir. 2004) (holding that courts assessing as applied challenges should not consider "hypothetical situations at the periphery of the [law's] scope"); Hill v. Colo., 530 U.S. 703, 733 (2000) ("[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications.").

Thus, the Court rejects Kassir's vagueness challenge.

## CONCLUSION

Kassir's motion under Rules 29 and 33 of the Federal Rules of Criminal Procedure is denied.

SO ORDERED.

Dated:     New York, New York
           September  / / , 2009

                                    JOHN F. KEENAN
                            United States District Judge